IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PRINCE D. KEY,

      Plaintiff,

v.

ROBERT SHANNON, JOSEPH CICHANOWICZ,
JOSHUA KOLBO, and GARY BOUGHTON,

      Defendants.

OPINION and ORDER

17-cv-521-jdp

---

  Pro se plaintiff Prince D. Key, an inmate at Wisconsin Secure Program Facility (WSPF), alleges that defendants, all prison officials at WSPF, violated his rights by failing to provide him with his medication on four occasions. Key is proceeding under the Eighth Amendment against all defendants. He is also proceeding against defendant Robert Shannon under the First and Fourteenth Amendment and under a Wisconsin-law negligence theory.

  Defendants have filed a motion for summary judgment. I will grant defendants' motion for summary judgment in part: I will dismiss Key's retaliation and equal protection claims in their entirety, and I will dismiss most of Key's deliberate indifference claims. But because it is not clear from Key's medical records whether defendant Shannon denied Key stomach-pain medication on February 21, 2017, I will stay a ruling on Key's deliberate indifference and negligence claims related to this incident and order the parties to submit supplemental materials.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Plaintiff Prince D. Key is an inmate at Wisconsin Secure Program Facility, in Boscobel, Wisconsin. Defendants are all prison officials at WSPF. Defendant Robert Shannon is a correctional officer, defendant Joseph Cichanowicz is a supervising officer, defendant Joshua Kolbo is a sergeant, and defendant Gary Boughton is the warden.

Key suffers from post-traumatic stress disorder (PTSD), anti-social personality disorder, and depression. Key also suffers from ulcerative colitis, a disease that causes inflammation in the digestive tract. Key's claims in this case stem from four incidents in February and March 2017 in which he was denied or experienced delay in receiving his medications for both his mental health problems and ulcerative colitis: February 21, 2017, February 24, 2017, March 17, 2017, and March 24, 2017.

A. Key's medications

At some point in February 2017, Key was prescribed paroxetine, an anti-depressant, and trazadone, an anti-depressant and sedative, to treat his mental health conditions. Key was also prescribed diphenhydramine, an antihistamine prescribed to treat nausea. Key does not dispute that he was prescribed these medications, and he says that he was also prescribed promethazine, an antihistamine used to treat stomach pain. Defendants dispute that Key was prescribed promethazine on either February 21 or 24, 2017. Defendants say that Key was first prescribed promethazine on March 8, 2017. But Key's "Medication/Treatment Record" appears to show otherwise. This is a record kept by the prison that lists Key's medications and contains notations denoting the specific days when Key received each medication in his cell. Dkt. 18-7. The meaning of every notation on the record is not self-evident, and the parties do

not fully explain the information on it. But the document appears to show that Key was given promethazine a few days in early February.

In March 2017, Key was prescribed mirtazapine, an anti-depressant, in addition to paroxetine to treat his mental health conditions. Beginning on March 8, 2017, Key also was prescribed promethazine.

**B. Medication distribution procedure**

We begin with some background on how medication is distributed at WSPF. When it is time for "med pass" to begin, the unit's control center issues a public-address announcement. To make the med pass run smoother, each inmate with a prescription is encouraged to use the intercom to confirm that he indeed wants his prescribed medication. After the announcement, staff members in the control center compile a list of inmates who responded to the PA message. Inmates who do not reply will not be on the list for medication, but staff should provide medication if an inmate requests it during the med pass.

When conducting a med pass, officers give an inmate medication by putting it in a paper cup and placing it on the ledge of the opened "trap" in the inmate's door. Opening the trap inevitably poses some risk to the officer. For example, an inmate could attempt to attack an officer with a weapon or throw urine or feces at the officer. So for the safety of staff members conducting the med pass, inmates are required to have their light on and be fully clothed.

The incidents complained of in this case all occurred during the "bedtime" med pass. Because defendant Shannon was assigned to second shift, working from approximately 2:00 p.m. to 10:00 p.m., he was responsible for dispensing Key's bedtime medications.

## C. Denied or delayed medications

### 1. February 21, 2017

On this date, Shannon passed out "bedtime" medication to inmates. Key did not reply to the med pass PA announcement. When Shannon passed by Key's cell, Key told Shannon that he wanted his medication. Shannon did not give Key his medication.

Key then contacted defendant Sergeant Joshua Kolbo. The parties disagree about precisely what Kolbo did in response, but they agree that Kolbo approved Shannon's denial. Key did not receive his medication until approximately two hours later, when he asked third-shift officers.

Key then wrote the unit manager, who is not a party to this lawsuit, telling him that Shannon had denied him his medication. In response, the unit manager told Key that he would talk to staff; the manager then told Shannon that although past practice had been to mark an inmate's failure to respond by intercom as a refusal of medication, current practice was to provide the medication if an inmate requests it.

The next day, Key wrote the warden, defendant Boughton, complaining about the incident. Key also filed an inmate grievance. The letter and grievance were not resolved until much later. The complaint examiner recommended that Key's grievance be "affirmed"—in the DOC's parlance, that means that Key should win his grievance—and she stated that although Key should use the intercom to request his medication, staff should still give the inmate his medication even if the inmate failed to answer the PA call. The complaint examiner told Key that the unit supervisor spoke to Shannon about the issue. On March 15, 2017, defendant Boughton accepted the recommendation and affirmed the grievance. Boughton responded to Key's February letter on March 21, 2017, stating, "It is helpful when inmates signal on the

intercom they want their medications" and, "when both staff and inmates make an effort to fulfill [medication] service delivery, the outcomes can be much more desirable." Dkt. 17, at 2 ¶ 3.

### 2. February 24, 2017

The second incident occurred three days later, while Key's grievance was pending. Key was wearing a "du-rag" head covering when Shannon came by to pass out medication. Key was housed in general population, and only inmates in the Restrictive Housing Unit are required to remove head coverings during med pass. But Shannon says that he believed all inmates were required to remove head coverings during med pass for safety reasons—the concern being that an inmate could hide a weapon or other harmful material with which he could harm the officer while the trap was open. Key disputes that there was any such policy or that Shannon thought there was: Key says that he had previously worn a du-rag during med pass and Shannon had not asked him to remove it. Key also says that when Shannon instructed him to remove his du-rag, Shannon said, "since people want to complain, now we're following all the rules." Key removed his du-rag and Shannon gave him his medication.

Afterward, Key filed a grievance. The grievance was rejected as not raising a significant issue because Key received his medication. The parties dispute whether Boughton reviewed that rejection.

### 3. March 17, 2017

On this date, Shannon again refused to give Key his medication until he removed his du-rag. During this incident, Key says that he showed Shannon a copy of the inmate handbook, which did not require that inmates in general population remove du-rags. Shannon says that nevertheless, he was suspicious that Key's refusal meant that he may be hiding something

5

dangerous. Key eventually complied with Shannon's order to remove his du-rag, and Shannon gave him his medication.

After this incident, Shannon requested that the sergeant on duty contact a supervisor. Defendant Joseph Cichanowicz was the supervisor on March 17, 2017. Key says that Cichanowicz told the sergeant that Shannon was correct to ask Key to remove his du-rag when the door trap was opened. Shannon says that Cichanowicz met with him and told him that the policy to have inmates remove their du-rags applied only in the Restrictive Housing Unit, and not the general population unit that Key was in. But Shannon also says that officers always retain the right to give inmates orders to remove a head covering for safety reasons. Key filed a grievance that was rejected as insignificant because he received his medication that day. Key appealed and defendant Boughton approved the rejection.

4. March 24, 2017

On this date, Shannon and Key had another disagreement during med pass. By this time, Shannon had been made aware that there was no policy requiring general population inmates to remove head coverings for med pass. When Shannon came around for med pass, Key was again wearing a du-rag. Shannon says that in an effort to avoid further "commotion," he instructed Key to stand in the middle of his cell, rather than remove his du-rag. Shannon says that after Key complied and stood in the middle of his cell, he dispensed the medication to Key. But Key disputes this: he says that Shannon denied him his medication and another officer gave him his medication. Key does not say whether he was given his medication during or after Shannon's med pass.

Key filed a grievance about this incident. The grievance was rejected because the issue had previously been addressed. Defendant Boughton approved that rejection.

6

ANALYSIS

To succeed on their motion for summary judgment, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment should be granted to the moving party. *Celotex*, 477 U.S. at 322.

**A. Eighth Amendment delayed medical care claims**

Key alleges that defendant Shannon was deliberately indifferent to his serious medical needs by denying him medication or delaying in providing it. Key also alleges that defendants Cichanowicz, Kolbo, and Boughton were deliberately indifferent by condoning Shannon's actions.

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73

(7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Key eventually received his medications on all four occasions, but that does not necessarily defeat his claims. Deliberate indifference can include the delay in access to medical care. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). "A delay in treating non-life-threatening . . . conditions may constitute deliberate indifference if the delay exacerbated the [condition] or unnecessarily prolonged the inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). The length of delay considered tolerable depends on "the seriousness of the condition and the ease of providing treatment." *McGowan*, 612 F.3d at 640. Shannon's actions delayed Key's access to medications for both his mental health problems and his ulcerative colitis. Because the facts surrounding Key's mental health medication and ulcerative colitis medication are different, I will address them separately.

1. **Mental health medications**

To establish that defendants were deliberately indifferent to his mental health problems under a delayed access-to-medical-care theory, Key must show that he was harmed by the delay in receiving his mental health medications (paroxetine, trazadone, and mirtazapine). *See, e.g.*,

8

*Arnett*, 658 F.3d at 753. Other than stating that he suffers from depression, anti-social personality disorder, and PTSD, Key has not explained how he was harmed by receiving his mental health medications two hours late on February 21, 2017, and a few minutes late, at most, on February 24, 2017, March 17, 2017, and March 24, 2017. Without such an explanation of how his mental health problems were exacerbated by the relatively short delays at issue here, no jury could find in Key's favor. For this reason, I will grant defendants' motion for summary judgment on Key's deliberate indifference claims concerning medications for his mental health conditions.

   2. **Ulcerative colitis medication**

Key says that he suffers pain as the result of his ulcerative colitis and that he was denied medication to treat this pain. Key alleges that Shannon denied or delayed in providing his ulcerative colitis medications on four occasions. He also alleges that Cichanowicz, Kolbo, and Boughton condoned those actions.

But the undisputed facts show at most only a minutes-long delay for the second, third, and fourth incidents. Because Key received his medications on February 24, 2017, March 17, 2017, and March 24, 2017, after complying with Shannon's requests, any extremely short delay Key experienced in receiving his medications on these dates was insignificant. Key has established a moderate delay for only the first incident; therefore, I will grant defendants' motion regarding the second, third, and fourth incidents. Because the claims against Cichanowicz and Boughton concern only these incidents, I will dismiss them from the case. That leaves Key's claims against Shannon and Kolbo for the first incident, on February 21, 2017, where there was a two-hour delay.

The claims that stem from the first incident require further analysis. For the purposes of this motion, I will assume that Key was in pain and that Shannon knew that. This leaves the questions whether Key suffered prolonged pain because Shannon did not provide him with medication for his stomach pain and whether Kolbo contributed to Key's prolonged pain by affirming the denial.

Whether a reasonable jury could find in Key's favor depends on whether Shannon was supposed to give Key stomach-pain medication on February 21, 2017. But it is unclear whether Shannon was supposed to give Key stomach-pain medication that day. Defendants provide contradictory statements regarding what medications Key was prescribed and when. But the only stomach-pain medication that is part of this record is promethazine, an antihistamine prescribed for Key's stomach pain. Defendants have said both that Key was prescribed promethazine in February 2017, and that Key was first prescribed promethazine on March 8, 2017.

Defendants provided Key's "Medication/Treatment Record" in support of their motion for summary judgment. Defendants have submitted a declaration that briefly explains the record's contents, *see* Dkt. 18, ¶ 36, but they have not submitted any affidavits or declarations explaining the proper interpretation of this record. Based on these submissions, I cannot be certain what the record means. The record appears to list Key's prescriptions and dosage, has dates underneath each medication that might be prescription expiration dates, and contains markings that seem to indicate the individual dates Key received each medication in his cell. Key's February medication record has notations suggesting that he received promethazine a few days in early February 2017. But there is a date, February 9, 2017, written underneath the listing for promethazine on the record that I suspect to be an expiration date. In response to

defendants' contention that the medications Key received during the bedtime med pass in February were paroxetine, trazodone, and diphenhydramine, Key says that he "also received promethazine for stomach pain related to ulcerative colitis." Dkt. 38, ¶ 49. But Key does not say when in February 2017 he was prescribed promethazine, nor does he cite any evidence supporting his statement.

Because it is unclear from the Medication/Treatment Record whether Key was prescribed promethazine on February 21, 2017, I will give defendants a short time to submit a supplemental brief citing whatever evidence they have supporting their assertion that Key was not prescribed promethazine on February 21, 2017. I will also give Key a short time to respond with a declaration and any other evidence he may have showing that he was prescribed promethazine on February 21, 2017. I will not require the parties to submit additional proposed findings of fact.

## B. Negligence

Key also alleges, under Wisconsin-law negligence, that Shannon was negligent by denying him his medications. Because I have not yet addressed all Key's federal claims, I will address Key's negligence claim after receiving the parties' supplemental materials.

## C. First Amendment retaliation claim

Key alleges that defendant Shannon retaliated against him for filing an inmate grievance regarding the February 21, 2017, incident by requiring him to remove his du-rag and stand in the middle of his cell to receive his medications as detailed in the discussion of the second, third, and fourth incidents. Because these commands are not sufficient to deter a person of ordinary firmness from engaging in protected First Amendment activity, I will grant defendants' motion for summary judgment on this claim. (Defendants also raise a qualified

immunity defense to Key's retaliation claim, but I need not address qualified immunity because I am granting defendants' motion for summary judgment on the merits.)

To prevail on a First Amendment retaliation claim, Key must identify (1) the constitutionally protected activity in which he was engaged; (2) one or more retaliatory actions taken by Shannon that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) sufficient facts to make it plausible to infer that his protected activity was one of the reasons Shannon took the action he did against him. *Bridges v. Gilbert*, 557 F.3d 541, 556 (7th Cir. 2009). Neither party disputes the first element because Key engaged in constitutionally protected activity when he filed grievances and lawsuits related to Shannon's actions. *See, e.g., Gomez v. Randle*, 690 F.3d 859, 866 (7th Cir. 2012); *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010). But defendants dispute both the second element, arguing that Shannon's orders were not sufficient to deter a person of ordinary firmness from filing future complaints and the third element, arguing that Shannon did not have Key remove his du-rag and stand in the middle of his cell because Key filed a complaint.

I will address the intent element first. Defendants contend that Shannon relied on valid security concerns in directing Key to take his du-rag off or stand in the middle of his cell. But to meet his burden on this element, Key does not have to show that retaliation was Shannon's *only* motivation for making those orders. *See, e.g., Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (holding that a plaintiff "does not need to show that is it litigation history was the only factor that motivated the defendant['s]" retaliatory action). A reasonable jury could conclude that Shannon made those orders for both reasons. Key says that when Shannon ordered him to remove his du-rag on February 24, 2017, he told him "since people want to complain, we're following all the rules now." On summary judgment I must credit Key's version

12

of events, despite Shannon's denial, and this statement suggests that Shannon intended to retaliate against Key. Key has adduced evidence from which a reasonable jury could find in his favor on this element.

As for the question whether Shannon's alleged actions would deter a person of ordinary firmness from filing complaints in the future, defendants contend that Key cannot succeed on this element because he continued to file inmate complaints. But because the court applies an objective, not subjective, test to determine whether the alleged retaliatory actions would deter a person of "ordinary firmness" from engaging in the protected activity, Key did not forfeit his retaliation claim against Shannon by continuing to file inmate grievances or initiating this lawsuit. *See, e.g., Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011); *see also Rozak v. Randt*, No. 15-cv-367-jdp, 2018 U.S. Dist. LEXIS 66446 (W.D. Wis. Apr. 20, 2018) ("I am wary of placing prisoners in a 'catch-22' where they cannot succeed in retaliation lawsuits because their lawsuit itself shows that their speech was not chilled").

Nonetheless, defendants have a point about the seriousness of the alleged retaliatory actions. Being made to remove a du-rag or stand in the middle of a cell are simply too minor of deprivations to implicate the First Amendment. *See Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (holding that "trivial harms, petty slights, [and] minor annoyances" do not rise to the level of materially adverse action necessary to sustain a retaliation claim); *see also Conrad v. Dunahay*, No. 17-cv-418-jdp, 2019 U.S. Dist. LEXIS 21561 (W.D. Wis. Feb. 11, 2019) (holding that denial of a plaintiff's preferred style of eyeglass was too minor a deprivation to implicate the First Amendment); *Bridges*, 557 F.3d at 555 (holding that "[a] single retaliatory disciplinary charge that is later dismissed is insufficient" to deter a person of ordinary firmness).

For this reason, I will grant defendants' motion for summary judgment on Key's First Amendment retaliation claim.

**D. Equal protection class-of-one claim**

Key alleges that defendant Shannon violated his Fourteenth Amendment rights under an equal protection class-of-one theory because Shannon treated him differently than other similarly situated inmates. Key says that Shannon made him—but not other inmates—remove his du-rag and stand in the middle of his cell to receive his medication, because Shannon did not like him. Defendants seek summary judgment on this claim, contending in part that Shannon is entitled to qualified immunity. Because a class-of-one claim in the prison context is not clearly established, I will grant defendants' motion for summary judgment on Key's equal protection class-of-one claim.

Government officials are entitled to qualified immunity unless their conduct violated a federal statutory or constitutional right, and the unlawfulness of their conduct was "clearly established at the time." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018). Key has the burden of demonstrating that Shannon's violation of the Fourteenth Amendment was "clearly established." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). Key can show that the violation was clearly established if "a violation of this right has been found in factually similar case, or that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008).

This court has previously expressed concern about applying class-of-one claims in a prison context. *See, e.g., Taliaferro v. Hepp*, No. 12-cv-921-bbc, 2013 WL 936609 (W.D. Wis. Mar. 11, 2013). Neither Key nor my own research uncovers any case law establishing class-of-

one claims in the prison context. Given the lack of clear instruction by higher courts, Key's rights are not clearly established, and Shannon is entitled to qualified immunity. Therefore, I will grant defendants' motion for summary judgment on Key's equal protection class-of-one claim.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 34, is GRANTED IN PART, as set forth above.

2. Defendants Joseph Cichanowicz and Gary Boughton are DISMISSED.

3. The remaining defendants may have until July 25, 2019, to submit materials supplementing their motion for summary judgment as explained in the opinion above. Plaintiff Prince D. Key may have until August 1, 2019, to respond.

Entered July 18, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge